Filed 7/31/23  In re W.Y. CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re W.Y. et al., Persons Coming Under the Juvenile Court Law. | |
| W.K.Y. et al., <br><br> Petitioners, <br><br> v. <br><br> SUPERIOR COURT OF CONTRA COSTA COUNTY, <br><br> Respondent, <br><br> CONTRA COSTA COUNTY CHILDREN AND FAMILY SERVICES BUREAU, <br><br> Real Party in Interest. | A167653 <br><br> (Contra Costa County Super. Ct. Nos. J2200428, J2200429) |

J.F. and W.K.Y. (Mother and Father, collectively Parents) petition for extraordinary writs compelling the juvenile court to vacate its order denying them reunification services with their children, W.Y. and A.Y., and setting a hearing pursuant to Welfare and Institutions Code section 366.26[1] to terminate parental rights. The order rests on findings that Parents caused the death of the children's 18-month-old sibling O.Y. by abuse or neglect. Parents also contend that the juvenile court abused its discretion in denying

---

[1] All statutory references are to the Welfare and Institutions Code.

1

them visitation with the surviving children, and Father contends that the court erred in implicitly finding that the Contra Costa County Children and Family Services Bureau (the Bureau) satisfied its duty of further inquiry into whether the children are subject to the Indian Child Welfare Act (25 U.S.C. § 1901 et seq. (ICWA)), after it discovered reason to believe that they might be Indian children.

Parents have shown no abuse of discretion in the setting of a section 366.26 hearing. However, while there was substantial evidence that visitation would be detrimental to W.Y., there was no such evidence as to A.Y., whose distinct interest in visitation was not meaningfully addressed. We thus vacate the order insofar as it denies visitation with A.Y. and direct the juvenile court to assess visitation specifically as to her.

The court also erred in implicitly finding that the Bureau satisfied its duty of further inquiry under California law related to ICWA (§ 224 et seq.). After Father stated that his grandfather had Cherokee ancestry and provided contact information, the Bureau did not document its efforts to contact the grandfather in a way sufficient to permit a finding of diligence. And while the Bureau reported sending inquiry notices about the children to three Cherokee tribes, it did not submit copies of the notices to enable evaluation of their adequacy by the court. We thus conditionally affirm the disposition order subject to the court's duty to confirm that the Bureau will satisfy its duty of further inquiry.

As the parties are familiar with the factual and procedural history of the case, and this opinion does not warrant publication, we need not recite the full history. (*People v. Garcia* (2002) 97 Cal.App.4th 847, 851.) We instead summarize as necessary the parts of that history relevant to the issues raised by the petitions. While the propriety of a section 366.26 hearing is plainly the

central issue, we discuss that of visitation first, as it gives rise to and informs our assessment of one argument raised about the section 366.26 order.

**1. The Court Properly Denied Visitation with W.Y. But Must Separately Assess the Propriety of Visitation with A.Y.[2]**

At the initial hearing on August 30, 2022[3], the court ordered weekly joint supervised visitation for both parents. On September 29, after two visits that went well, the Bureau applied ex parte to suspend visitation because, after the second visit, three-year-old W.Y.'s aggressive behavior toward four-month-old A.Y., and a younger child in the home where they were placed, escalated in a way necessitating a change in placement. The Bureau reported no harmful effects of visitation on A.Y. It also noted that Parents were exhibiting conflict and volatility and showing signs of substance abuse. The court granted the request.

At a hearing a week later, the court left visitation suspended, noting the likelihood of harmful effects on W.Y. The court identified no detriment to A.Y. It renewed the suspension of visitation on October 27 and November 17, each time referring only to detriment to W.Y.

The next hearing was the jurisdiction hearing two and a half months later, on February 2. Its focus was medical testimony, but the court allowed counsel to briefly address visitation. Noting that W.Y. had begun therapy

---

[2] Of necessity, Parents limit their requests for prospective writ relief to the order denying visitation now in effect, issued at the disposition hearing. We discuss the prior orders suspending visitation both because they provide background essential to the operative order and because Mother contends that the prior denials unfairly prevented her at the disposition hearing from demonstrating bonds with the children, which could have enabled her to prove that reunification services were in their best interest (see part 2, *post*).

[3] All proceedings at issue occurred between August 2022, when the case was filed, and the April 2023 disposition hearing, so all unspecified references to dates are correspondingly to 2022 or 2023.

that day, the Bureau's counsel represented that the therapist recommended delaying contact with Parents. The court asked "What about for [A.Y.]?" but then said, "Oh, [A.Y.] is seven months [old]." In cross-talk, the Bureau's counsel said, with apparent regard to A.Y., "The information, I believe, was that it would be detrimental to do that right now." Each parent's counsel asked to be put on the waitlist for therapeutic visitation. The court declined to resume visitation or order that parents be put on the therapeutic-visitation waitlist, noting only the detriment to W.Y.

The record does not make clear the basis for the Bureau's counsel's representation that supervised visitation would be detrimental for A.Y. The social worker had spoken a week earlier with the therapist who had been assigned to (but not yet begun treating) W.Y. The therapist "reported that she will be monitoring [A.Y.]'s mental health status as she is not currently displaying any signs of concern." The therapist, as paraphrased in the report, noted that although A.Y. "was only four-months-old when she was detained . . . [,] she was still exposed to ongoing domestic violence and the incident with [O.Y.]," and that "studies have shown" that even if a child is an infant when exposed to trauma, "there is still an impact on their emotional and mental health." The record does not indicate that the therapist had assessed A.Y., or expressed a view as to the effects of visitation on her.

The jurisdiction hearing resumed on March 23 (after continuances due to illness). At that point, each parent requested that visitation resume, but the court deferred the issue to the disposition hearing, which occurred on April 20. In its memo, the Bureau reported a discussion on March 1 with the therapist who had begun play therapy with W.Y. and opined it was too soon in the process to reintroduce visitation.

4

At the April 20 disposition hearing, Father again asked to resume visitation; each parent objected to a finding of detriment. In its disposition ruling, the court found that reunification was not in the children's best interest because "it is clear, and this also dovetails with the detriment issue with respect to visitation, that even visits with the parents resulted in disastrous, but very enlightening effects on [W.Y.], in particular." In summarizing those effects, the court did not identify any that were felt by A.Y. It found that supervised visitation "would be detrimental to the children, given the information . . . provided, in particular, by the children's therapist, but also by . . . the caretakers . . . as to the detrimental reactions that the— [W.Y.], in particular, underwent after his visits."

We review visitation orders for abuse of discretion (*In re Emmanuel R.* (2001) 94 Cal.App.4th 452, 465) and findings that visitation would be detrimental for substantial evidence. (*In re A.J.* (2015) 239 Cal.App.4th 154, 160.)

Here, the court made a series of well-grounded rulings that visitation would be detrimental to W.Y.; substantial evidence supported those rulings, which were well within the court's discretion.

As to A.Y., however, the record lacks substantial evidence to support the findings of detriment. The Bureau contends as to both children, the court did not abuse its discretion given its denial of reunification services. The Bureau cites subdivision (f) of section 361.5, which states that if, pursuant to subdivision (b), a court denies reunification, it may permit visitation pending a permanency hearing unless it finds that visitation would be detrimental, in which case it may not order visitation (*In re J.N.* (2006) 138 Cal.App.4th 450, 457). The Bureau contends that the court did not abuse its discretion by treating the children as a unit for purposes of visitation in light of the

importance, once reunification was denied, of avoiding detriment to A.Y. by stabilizing the children's placement and keeping them together, which depended on W.Y. moving past his aggression toward younger children.

While we agree with the benefits of keeping A.Y and W.Y. together, there is no evidence that it would be detrimental to let Parents visit A.Y. *alone.* While their final visit with both children together correlated with and may have caused aggressive behavior by *W.Y.*, nothing in the record suggests that past visits detrimentally affected A.Y., or suggests how a future supervised visit with *A.Y. alone* would detrimentally affect either child. Further, the Bureau's reliance on the denial of reunification services is problematic for two reasons: (1) it cannot justify the lack of visitation with A.Y. in the seven months before the denial of reunification; and (2) nothing in the record suggests that the court considered this fact and used it as a basis for its decision.

The only time the record shows the court distinctly considered whether visitation would be detrimental to A.Y. is the February 2 hearing. The only ground raised was the Bureau's counsel's representation—based, we assume, on a good-faith misunderstanding—that "The information, I believe, was that it would be detrimental to do that right now." In fact, W.Y.'s therapist had said only that, in general, a four-month-old could suffer trauma from seeing abuse—not that she had concluded that A.Y. did so. The record thus contains no evidence that visitation would have been detrimental to A.Y.

Accordingly, the order denying visitation is affirmed as to W.Y. but reversed as to A.Y., and the court is directed to consider whether supervised visitation with A.Y. alone would be detrimental to A.Y. In so ruling, we are mindful that, "[a]fter the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer

6

paramount" and " 'the focus shifts to the needs of the child for permanency and stability' " (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317), and that after reunification ends, section 361.5 merely gives a court discretion to order visitation if it would not be detrimental (*In re J.N.*, *supra*, 138 Cal.App.4th at p. 457). While the court may find that supervised visitation for the rest of this case would be detrimental to A.Y., or may choose not to exercise its discretion to allow visitation, it must base those decisions on the distinct effects of visitation on A.Y. herself.

### 2. The Court Did Not Abuse Its Discretion By Denying Reunification Services and Setting a Section 366.26 Hearing

In deciding to deny reunification services and set a section 366.26 hearing, the court relied on section 361.5, subdivision (b), which states that "[r]eunification services need not be provided to a parent . . . when the court finds, by clear and convincing evidence, . . . [¶] . . . [¶] (4) That the parent . . . has caused the death of another child through abuse or neglect." That provision is mandatory, but subject to an exception allowing a court to order services for such a parent who bears the burden of proving, by clear and convincing evidence, that reunification is in the best interests of the child. (§ 361.5, subd. (c)(2); see *In re A.E.* (2019) 38 Cal.App.5th 1124, 1141 [subdivision (a) of section 361.5 "provides that reunification services are mandatory unless a bypass provision applies"; subdivision (b) "lists the bypass provisions and provides that reunification services are discretionary if any of them apply"; but subdivision (c) "provides that *denial* of reunification services is *mandatory*, not discretionary, with respect to nearly all of the bypass provisions, unless the court makes certain countervailing factual findings"].)

The court found by clear and convincing evidence, based on the undisputed testimony of an expert in the medical evaluation of child abuse and neglect, that one or both parents inflicted O.Y.'s fatal injuries, and that

7

both must have been aware that something was horribly wrong with her for hours before Mother called 911—a delay that eliminated the possibility of medical care saving O.Y.'s life. In sum, "[b]oth parents should have known something significant was wrong, and both parents were negligent at best, and horribly abusive, at worst."

Neither parent challenges the presence of substantial evidence to support the finding that section 361.5, subdivision (b)(4) applied. Each argues instead that the court abused its discretion in failing to find that they bore their burden of proving, by clear and convincing evidence, that reunification was nonetheless in the best interests of their surviving children pursuant to subdivision (c)(2), or alternatively that the court's decisions about visitation, and a delay in starting therapy for W.Y., unfairly made it impossible for them to bear that burden, and for the court to assess fairly if reunification might be in the children's best interest. We review for abuse of discretion the finding that Parents did not bear their burden under subdivision (c)(2). (*In re A.E.*, *supra*, 38 Cal.App.5th at pp. 1140–1141.)

In *In re Ethan N.* (2004) 122 Cal.App.4th 55 (*Ethan N.*), the Fifth District clarified the tremendous burden imposed by section 361.5: "Subdivision (b)(4) . . . evidences the Legislature's recognition that some situations are so extreme as to require extraordinary caution in recognizing and giving weight to the usually desirable objective of family preservation. . . . [W]hen child abuse results in the death of a child, such abuse 'is simply too shocking to ignore' in determining whether the offending parent should be offered services aimed at reunification with a surviving child. 'The fact of a death and a subsequent petition . . . arising out of that death simply obliterates almost any possibility of reunification . . . .' " (*Id.* at p. 65.) In preserving some "possibility of reunification" in subdivision (c)(2), the

8

Legislature "left open 'a tiny crack' to the parent who has been responsible for the death of his or her child." (*Ibid.*) Relevant factors in assessing the best interest of surviving children include " 'a parent's current efforts and fitness as well as the parent's history' "; " 'the gravity of the problem leading to dependency' "; "the strength of the bonds between the child and the parent and the child and the caretaker," and the " 'child's need for stability and continuity.' " (*In re William B.* (2008) 163 Cal.App.4th 1220, 1228, quoting *In re Ethan N.*, at pp. 66–67.)

Here, Parents have failed to show that the court abused its discretion in finding that they did not bring themselves, by clear and convincing evidence, within the very narrow exception at issue.

While the record demonstrates that both parents completed their case plans in a prior dependency proceeding based on substance abuse that was closed in April 2022, and that Father took some actions during these proceedings to address his issues (including parenting and domestic violence classes and individual therapy),[4] each parent failed to appear for all but a handful of drug tests during the time the case was pending. Most importantly, as the County notes, Parents' success in reunifying with the children in April 2022 "rings quite hollow" in light of O.Y.'s horrific death, four months later, from abuse and neglect.

The record thus supports the court's findings that Father's and Mother's progress toward alleviating the causes that necessitated foster care had been "minimal" and "none," respectively. The efforts by the Parents still fall far

---

[4] While social workers substantiated Father's claim of insurance-based problems in accessing substance abuse treatment, the question under section 361.5, subdivision (c)(2) is whether a parent has shown that reunification is in the best interests of surviving children—not whether he has made a good-faith effort to address the problems that led to their removal.

short of the exemplary progress required for parents responsible for a child's death to bring themselves within the "tiny crack" left open by section 361.5, subdivision (c)(2). (*Ethan N.*, *supra*, 122 Cal.App.5th at p. 65.)

The remaining factors also support the court's decision. The gravity of the problem leading to dependency could hardly be greater, and the evidence of parent/child bonds was weak. A.Y. was not yet four months old when detained, and by the time of the disposition hearing eight months later had spent over half her life thriving in the undisputedly loving care of foster caregivers to whom she had bonded and who were prepared to care for her indefinitely. Thus, the record supports the court's finding that reunification would not be in A.Y.'s best interest.

As to W.Y., while the children had two pleasant parental visits early in the case, and W.Y. tried to leave with Parents at the end of one, and cried briefly when separated, he was "easily consoled" and, in five months with his foster caregivers, "never mentioned or asked about his parents." The record compellingly shows that W.Y.—who very likely witnessed the fatal abuse of O.Y. and has been diagnosed with post-traumatic stress disorder (PTSD)—, suffered the effects of PTSD after the final visit with Parents, which, after other triggering events, caused him to become deeply upset and troublingly aggressive. His caregivers reported that, when his placement began, he several times said "baby hurt, baby hurt" while making a punching motion, and sang himself to sleep saying, "mommy, daddy, ouchie, ouchie," but later came to say "happy happy happy happy." The record contains other vivid examples of how the greater strength of W.Y.'s bonds with his current caregivers, and his profound need for stability and continuity in a placement that will not trigger his PTSD, made it impossible to show that reunification would be in W.Y.'s best interest.

Parents note that, from early in the case, each asked that W.Y. receive therapy and/or therapeutic visitation, and that he was diagnosed with PTSD in October yet did not begin therapy until February, four months into the case. Mother contends that therapy could have enabled visitation, which could in turn have strengthened her ability to show bonds with the children, as required to satisfy section 361.5, subdivision (c)(2).

These contentions, even if true, fail to show that had the court allowed visitation with A.Y., and had W.Y. timely begun therapy, any marginal improvement in Parents' ability to demonstrate strong bonds with the children could have made a difference in their ability to prove by clear and convincing evidence that reunification was in the children's best interest. (See *Ethan N., supra*, 122 Cal.App.4th at p. 68 [even though mother had made significant progress, reunification was not proper because it is rare that reunification will serve the best interests of the child when the parent is responsible for the death of a child through abuse or neglect].)

### 3. The Court Erred in Implicitly Finding that the Bureau Satisfied Its Duty of Further Inquiry under ICWA[5]

"Congress enacted ICWA in 1978 to address concerns regarding the separation of Indian children from their tribes through adoption or foster care placement, usually in non-Indian homes. [Citation.] ICWA established minimum standards for state courts to follow before removing Indian children from their families and placing them in foster care or adoptive homes. [Citations.] In 2006, California adopted various procedural and substantive provisions of ICWA.." (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1048 (Guerrero, J.) (*D.S.*).) *D.S.*, authored by our now–Chief Justice when on the Court of

---

[5] The Bureau's and court's duties arise from ICWA, federal regulations implementing it, and California statutes that implement and augment duties imposed by federal law. For brevity, we refer to this set of laws as "ICWA."

Appeal, describes the framework of federal and state law governing the duty of the court and Bureau to inquire whether children in dependency proceedings qualify as "Indian children."[6] (*D.S.*, at pp. 1048–1051.) In brief, the process has three stages: The Bureau first has a duty of initial inquiry, which, if it reveals a reason to *believe* that a child may be an Indian child, triggers a duty of further inquiry, which, if it yields reason to *know* the child is an Indian child, entitles the tribe to receive notice of and intervene in the proceeding. (*Ibid.*) This case concerns only the duty of further inquiry triggered by a "reason to believe."

California law "specifies the steps the [Bureau] and the juvenile court are required to take in determining a child's possible status as an Indian child," a term ICWA defines to mean a child who " '. . . is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe . . . .' " (*D.S.*, *supra*, 46 Cal.App.5th at p. 1048, citing § 224.1, subd. (a).) "The [Bureau] and the juvenile court have 'an affirmative and continuing duty' in every dependency proceeding to determine whether ICWA applies. (§ 224.2, subd. (a) . . . ; Cal. Rules of Court, rule 5.481(a).)" (*D.S.*, at p. 1048.)

"Section 224.2, subdivision (b) specifies that once a child is placed into the temporary custody of a county welfare department, . . . the duty to inquire 'includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and [any] party reporting child abuse or neglect, whether the child is, or may be, an Indian child.' When the [Bureau] has 'reason to believe' that

---

[6] Because "Indian children" is a defined statutory term, we use it rather than "Native American" or "indigenous." For the same reason, we use the defined term "tribe" in a generic way to refer to Native American political entities that define themselves as nations, tribes, or bands.

an Indian child is involved, further inquiry . . . is required. (§ 224.2, subd. (e).) The required further inquiry includes (1) interviewing the parents and extended family members;[7] (2) contacting the [BIA] and State Department of Social Services; and (3) contacting tribes the child may be affiliated with, and anyone else, that might have information regarding the child's membership or eligibility in a tribe.[ ] At this stage, contact with a tribe 'shall, at a minimum,' include . . . contact to each tribe's designated agent for receipt of ICWA notice, and 'sharing information identified by the tribe as necessary for the tribe to make a membership or eligibility determination, as well as information on the current status of the child and the case.' (§ 224.2, subd. (e)(3).)" (*D.S., supra*, 46 Cal.App.5th at pp. 1048–1049.)

" 'The juvenile court may . . . make a finding that ICWA does not apply because the [Bureau]'s further inquiry and due diligence was 'proper and adequate' but no 'reason to know' whether the child is an Indian child was discovered. (§ 224.2, subds. (i)(2), (g).) Even if the court makes this finding, the [Bureau] and the court have a continuing duty under ICWA, and the court 'shall reverse its determination if it subsequently receives information providing reason to believe that the child is an Indian child and order the social worker or probation officer to conduct further inquiry.' (§ 224.2, subd. (i)(2).)" (*D.S., supra*, 46 Cal.App.5th at p. 1050.)

At the start of this case, each Parent filled out a Judicial Council form, indicating that none of the circumstances that subject a child to ICWA applies.

---

[7] Section 224.1, subdivision (c) adopts ICWA's definition of "extended family members," which generally includes grandparents but not great-grandparents.  (25 U.S.C. § 1903(2).) However, the duty of further inquiry also extends to "any other person that may reasonably be expected to have information regarding the child's membership status or eligibility" (Welf. & Inst. Code, § 224.2, subd. (e)(2)(B)–(C)), a category that plainly encompasses a living great-grandparent alleged to have Native American ancestry.

At several hearings, the court asked Parents and relatives if any of them knew of reason to believe the children might be "Indian children" for purposes of ICWA.

The first positive responses came at the February 2 hearing, at which Father said he had recently learned that his grandfather is "50 percent Native American." Also in attendance was Father's mother (Paternal Grandmother), who specified that Father's grandfather George Young (Paternal Great-Grandfather)—who was not present—is of Cherokee descent. Father's half-sister (Paternal Half-Aunt), an enrolled Comanche Native tribe member, expressed a belief that the children would qualify to be enrolled in the Cherokee—not Comanche—tribe.[8]

The court found reason to believe the children are Indian children and ordered the Bureau "to complete further inquiry as required by . . . section 224.2(e) and file with the court evidence of this inquiry, . . ." After health-related continuances, the court next addressed ICWA 11 weeks later, at the April 20 disposition hearing. The Bureau filed a memo detailing its further inquiry.

A table in the memo listed contacts with relatives including Paternal Half-Aunt, who had tried to gather information about the paternal side of Father's family. An entry for a February 23 conversation with Father stated that he had identified "an Aunt Bertie (last name unknown), who was possibly enrolled in the Cherokee nation, specific tribe unknown" and provided a phone number for paternal great-grandfather George Young. Father "reported that George Young lived in Grass Valley, and is difficult to

_____

[8] Father and Paternal Half-Aunt have the same mother, but her Comanche ancestry is through her father, so W.Y. and A.Y. have no genetic Comanche ancestry. No one suggested below that the children might be eligible for membership in the Comanche Native tribe.

get ahold of [because] he doesn't always answer his phone. [Father] reported [that George Young] would be the holder of any additional information [and] have Aunt Bertie's last name, but [the social worker] would need to contact him multiple times . . . to gain needed information."

Entries on February 27 and March 13 for "George Young | Paternal great grandfather" state only, "No response. Message left."[9]

The report next describes how the social worker sent "ICWA inquiry letters" by certified mail on February 27 to three tribes—the Cherokee Nation, the Eastern Band of Cherokee Indians, and the United Keetoowah Band of Cherokee Indians in Oklahoma—and the BIA. The Bureau did not submit copies of the inquiry letters with its memo (or otherwise).

The Bureau did attach copies of three responses. The Eastern Band wrote that the children are not eligible to register as members; the Cherokee Nation wrote that they are not "Indian children"; and the BIA sent a letter stating that the Bureau had not provided documentation that the children are eligible for membership in a recognized tribe. As of April 20, the United Keetoowah Band had not responded.

At the hearing that day, the court assessed the Bureau's inquiry. Summarizing its report, the court stated that Paternal Half-Aunt "does have tribal affiliations, but it appears that [they] are for the side of the family that is unrelated to [Father]." It noted "some possibility of . . . ancestry through father, specifically, through an Aunt Bertie, whose last name is unknown to

---

[9] A final entry on March 14 states that Paternal Half-Aunt emailed the social worker that she had spoken with Paternal Second Cousin, who knew nothing of Native American ancestry, but passed on the request to her mother. The entry states that the social worker requested contact information for Paternal Second Cousin and the name of her mother. The report, filed five weeks later, does not note any response or follow-up.

all parties" and "some indication that, perhaps, the paternal great grandfather would at least have Aunt Bertie's last name," but added, "it appears . . . that [the social worker] and all relatives have attempted to get in touch with that paternal great grandfather and have been unable to do so, and it has been a couple of months that parties have been working on that." Finally, the court summarized the responses (or lack thereof) from the three Cherokee tribes.

The court stated, "I will find that . . . while there was a reason to believe, there is currently no reason to know, that the children are Indian children. However, . . . pending that final letter from the Keetoowah Band of Cherokee,. . . I will withhold further ruling on that particular issue until we hear from that particular tribe." Father's counsel interjected that Paternal Great-Aunt had recently said that she believes the unfound relative is "Bernice," not "Bertie," and is a paternal great-grandmother, not an aunt; the court replied, "I imagine that the difference between 'Bertie' and 'Bernice' is not the salient problem . . . . It is that we need a last name." After adding, "should that last name come to anyone's knowledge in this courtroom, you are to let the Bureau and the court know immediately so that we can . . . follow up," the court ended the ICWA part of the hearing.

We review ICWA-related findings for substantial evidence; if the facts are undisputed, "we independently determine whether ICWA's requirements have been satisfied." (*D.S.*, *supra*, 46 Cal.App.5th at p. 1051.) Father contends that the court erred for three reasons in implicitly finding that the Bureau showed that it had discharged its duty of further inquiry as to the two tribes that responded to its notices: (1) the Bureau failed to submit copies of the notices, leaving the court unable to confirm that it had given the tribes all available information; (2) it did not make adequate efforts to contact

16

George Young; and (3) it chose not to contact the Comanche Native tribe based on an unfounded assumption that the children's lack of genetic ties to a member precluded eligibility. We agree with the first two points.

When an agency sends a further-inquiry notice, it "must include enough information for the tribe to 'conduct a meaningful review of its records to determine the child's eligibility for membership' " (*D.S.*, *supra*, 46 Cal.App.5th at p. 1050). " 'ICWA notice requirements are strictly construed.' " (*In re Y.W.* (2021) 70 Cal.App.5th 542, 557, disagreed with on other grounds by *In re Dezi C.* (2022) 79 Cal.App.5th 769, 779, review granted Sept. 21, 2022, S275578.) The Bureau bears the burden to " 'obtain all possible information about the minor's potential Indian background and provide that information to the relevant tribe.' " (*Ibid.*)

For present purposes, we need not determine exactly what information the Bureau was obliged to provide to the tribes, for the record does not include copies of the inquiry notices, which were essential for the juvenile court to assess the adequacy of the information provided. A court may not simply assume that an agency's notices were sufficient. (See, e.g., *In re K.R.* (2018) 20 Cal.App.5th 701, 709 ["Nor can the juvenile court assume that because *some* information was obtained and relayed to the relevant tribes, the social services agency necessarily complied fully with its obligations"], disagreed with on other grounds by *In re Dezi C., supra*, 79 Cal.App.5th at p. 779.) We lack a record enabling us to affirm the court's implied finding.

Further, the Bureau's showing regarding George Young, the great grandfather identified as the only lead for further information about Cherokee ancestry, is insufficient. The relevant table entries state only, "[Date] | George Young | Paternal great grandfather | No response. Message left." We cannot conclude that those entries suffice to support the implied

finding that the Bureau discharged its duty of further inquiry as to Mr. Young. The entries contain no facts showing that the message was left at a correct, current number for Mr. Young or the likelihood that he would receive the message. Given the insufficient description, we cannot determine if the Bureau's leaving of two messages amounted to due diligence in light of its failure to make any contact by a postal or email address or other means of contact (the record does not indicate any efforts to obtain alternative methods of contact), and whether two messages were sufficient in light of the warning that the Bureau would need to contact him "multiple times" to obtain information. As part of its duty to pursue " 'all reasonable investigative leads' " (*In re Y.W., supra,* 70 Cal.App.5th at p. 554), an agency must "make a meaningful effort to locate and interview extended family members" (*In re K.R., supra,* 20 Cal.App.5th at p. 709). While we do not hold that leaving unreturned phone messages can never amount to diligence in the further-inquiry context, nor can we hold on this record that doing so in an unspecified manner was sufficient in these circumstances.[10]

As for the assumption that the lack of genetic tie to a Comanche Native tribe member made the children ineligible for membership, it is true that a tribe's "determination of a child's membership or eligibility for membership in the tribe " 'shall be conclusive' " (*In re Isaiah W.* (2016) 1 Cal.5th 1, 9, quoting § 224.3, subd. (e)(1)), and that a tribe could have membership criteria that, in some circumstances, make persons eligible despite having no genetic descent

---

[10] Father also contends that the Bureau should have done more to contact the mother of the second cousin whom Paternal Half-Aunt described contacting (see fn. 9, *ante*). ICWA's definition of "extended family," however, does not encompass a second cousin once removed (25 U.S.C. § 1903(2)), and nothing the Paternal Half-Aunt said indicated that the woman was a "person that may reasonably be expected to have information regarding the child's membership status or eligibility" (Welf. & Inst. Code, § 224.2, subd. (e)(2)(B)).

from a tribe member. Father, however, identifies no facts giving rise to a reason to believe that he had a relationship with his half-sister's father that could have made him or his children members of or eligible for membership in the Comanche Native tribe. The court did not err with regard to that tribe.

## Disposition

The order denying reunification services and setting a hearing pursuant to Welfare & Institutions Code section 366.26 is conditionally affirmed with directions to ensure that the Children and Family Services Bureau complies with the inquiry and notice provisions of the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.) and related California law; any implied finding that it has done so is vacated. The order denying visitation with W.Y. is affirmed, but that order denying visitation with A.Y. is vacated with instructions to consider whether visitation with A.Y. alone would be detrimental to A.Y. and, if not, to exercise discretion (Welf. & Inst. Code, § 361.5, subd. (f)) whether to allow it. Our decision is final as to this court immediately. (Cal. Rules of Court, rule 8.490(b)(2)(A).)

_____

Fineman, J.*

WE CONCUR:


_____

Brown, P. J.


_____

Streeter, J.



A167653

---

* Judge of the Superior Court of California, County of San Mateo, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.